UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

| | | |
|---|---|---|
| RICHARD PATTON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:19-177-KKC |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| B. BLACKBURN, et al., | ) | **& ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendants' Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment. (DE 72.)  Plaintiff filed a Response (DE 75), to which Defendants filed a Reply (DE 76).  Having all relevant documents before the Court, the matter is now ripe for consideration.  For the following reasons, the Defendants' Motion (DE 72) will be **GRANTED.**

## I.    FACTUAL AND PROCEDURAL HISTORY

In 2012 Plaintiff Richard Patton, Jr. was sentenced by the Northern District of Alabama in four different cases to an aggregate term of imprisonment of 47 years and 8 months after being convicted of Armed Bank Robbery, Brandishing a Firearm During and in Relation to a Crime of Violence, Carrying a Firearm During a Crime of Violence, and Escape of Federal Prison.[1]  (DE 50-1 at Page ID 373.)  From July 2018 until August 2019 Patton was incarcerated at the United States Penitentiary ("USP") McCreary in Pine Knot, Kentucky. (*Id.;* DE 1 at Page ID 5.)  Patton filed this action challenging certain alleged treatment of him

---

[1] *See United States v. Richard Patton, Jr.,* Case Nos. 7:11-CR-289-VEH-HGD, 5:12-CR-73-AKK-TMP, 7:12-CR-307-AKK-JEO, and 7:12-CR-362-AKK-TMP.

in early December 2018 while he was incarcerated at USP McCreary.[2]  Patton is currently incarcerated at Florence USP in Florence, Colorado.

Patton initiated this action in July 2019 with his filing of a *pro se* Complaint, alleging claims of excessive force and deliberate indifference against various officers and medical staff at USP McCreary. (DE 1 at Page ID 2-3.)  Specifically, Patton sued Lt. B. Blackburn, Lt. B. Asher, Nurse Adam Morrow, Nurse Kathy Miracle, Dr. Carrie Cunnagin, Lt. D. Mullins, Lt. B. Messer, Lt. J. Posey, and Nurse Autumn Lawson. (*Id.*)  On prior review, the Court dismissed Patton's claims against Nurse Morrow, Dr. Cunnagin, Lt. Messer, and Lt. Posey. (DE 16 at Page ID 62.)  Thus, only Lt. Blackburn, Lt. Asher, Nurse Miracle, Lt. Mullins, and Nurse Lawson remain as Defendants in this action. (*Id.*)

Patton's claims can be broken down into four categories: (1) an excessive force claim against Lt. Blackburn for placing Patton in restraints on December 5, 2018, for, as Patton claims, Lt. Blackburn's "personal satisfaction" (DE 1 at Page ID 3); (2) an excessive force claim against Lts. Blackburn and Asher based on the length of time Patton was restrained (*Id.* at Page ID 3-4; DE 75 at Page ID 932); (3) an excessive force claim against Lts. Asher and Mullins when they allegedly "slammed" Patton to the floor and bent his wrist while moving him from ambulatory restraints to four-point restraints (DE 1 at Page ID 4); and (4) deliberate indifference claims against all five named Defendants for allegedly ignoring

---

[2] Patton has filed four other actions with this Court.  *See Richard Patton, Jr. v. K. Hall, et al.,* Case No. 7:17-cv-142-KKC (*Bivens* action filed September 6, 2017, challenging disciplinary hearing process for September 13, 2016 incident while Patton was housed at USP Big Sandy in Inez, Kentucky; *Richard Patton, Jr. v. Gregory Kizziah, Warden,* Case No. 6:18-cv-268-GFVT (Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 regarding the September 2016 incident report and disciplinary process at USP Big Sandy); *Richard Patton, Jr. v. Autumn Lawson, et al.,* Case No. 6:20-cv-79-DLB-EBA (*Bivens* action filed April 6, 2020, against corrections officers and medical officials at USP McCreary for alleged use of excessive force against him and deliberate indifference to his serious medical needs after Patton was placed in hard restraints on October 30, 2018); and *Richard Patton, Jr. v. T. Buster, et al.,* Case No. 6:21-cv-98-GFVT (*Bivens* action filed June 11, 2021, against corrections officers at USP McCreary for alleged use of excessive force against him on February 23, 2019).  The 6:20-cv-79-DLB-EBA and 6:21-cv-98-GFVT actions remain pending.

2

Patton's pleas that his restraints were too tight and that he needed medical attention (*id.* at Page ID 3-4). The factual circumstances surrounding each of Patton's claims is set forth below. The procedural history of this case is then briefly summarized.

### A. Patton's Excessive Force Claim Against Lt. Blackburn Based on Lt. Blackburn's Animus

Patton's first claim is that Lt. Blackburn placed Patton in "(steel handcuffs) restraints" for his own "personal satisfaction." (*Id.* at Page ID 3.) On December 5, 2018, Patton and another prisoner were in the special housing unit (SHU) lower law library when an officer, not named in this suit, asked Patton to put on paper clothing. (DE 56-2 at Page ID 666; DE 72-2 at Page ID 877-78.) When Patton refused to put on the paper clothing, the officer attempted to put Patton in hand restraints. (DE 56-2 at Page ID 666, 670.) The parties disagree as to whether Patton consented to or refused hand restraints. (*See id.* at Page ID 678; DE 72-2 at Page ID 879.)

A calculated-use-of-force team of corrections officers was assembled. The officers led Patton out of the law library in hand restraints, and then placed him in hard, ambulatory restraints.[3] (DE 56-2 at Page ID 594, 678.) Defendants explain that hard, ambulatory restraints were used because Patton has a "history of defeating restraints." (*Id.* at Page ID 594 n.1.)

The officers' placement of Patton into hard, ambulatory restraints was captured on video.[4] (*See* DE 53 (order granting the United States' motion for leave to file sealed video footage in the record).) Throughout that video, Patton claimed the officers' use of restraints

---

[3] Hard, ambulatory restraints are defined by the Federal Bureau of Prisons' Program Statement 5566.06 *Use of Force and Application of Restraints* as "steel handcuffs and leg irons" that "allow the inmate to eat, drink, and take care of basic human needs without staff intervention."

[4] The United States filed under seal security video footage from USP McCreary concerning the interactions among prison staff and Patton in early December 2018. (*See* DE 53.)

was improper and that he would inform the Regional Director, Lt. Blackburn, and Nurse Miracle that the restraints were applied too tightly around his wrists and abdomen.  (*Id*. at 22:03-22:07, 23:53-24:17.)  Nurse Miracle performed a medical assessment of Patton on camera, during which she checked his vitals and checked that the restraints were properly applied.  (*Id*. at 21:11-23:51.)  After her medical assessment of Patton, Nurse Miracle stated on camera that she found the restraints were appropriately applied and that she was able to place a finger between the cuffs and Patton's wrists.  (*Id*. at 32:01-32:31.)

During that same debriefing on camera, Lt. Blackburn explained that Patton would be kept in restraints until Patton exhibited "calming behavior."  (*Id*. at 30:58-31:17.)  Additionally, Lt. Blackburn's "Two-Hour Lieutenant Restraints Check Form" for Patton completed at 7:30 p.m. that evening noted that he placed Patton in restraints because Patton "verbally threatened to assault staff."  (DE 56-2 at Page ID 678.)

## B.   Patton's Excessive Force Claim Against Lts. Asher and Blackburn Based on Length of Restraint

Patton's second claim is that corrections officers kept Patton in restraints for longer than what was necessary to restore discipline.  (DE 1 at Page ID 4; DE 75 at Page ID 932 (alleging that Lts. Asher and Blackburn "were able to keep Patton in restraints for longer periods of time than permitted under FBOP [Federal Bureau of Prisons] Policy . . . .").)  According to the prison's documentation, Patton was in hard, ambulatory restraints from December 5, 2018, at 7:30 p.m., until December 6, 2018, at approximately 6:25 a.m., when he was moved from ambulatory restraints to four-point restraints.[5]  (DE 56-2 at Page ID 668, 679.)  Patton then remained in four-point restraints from 6:25 a.m. until 11:25 p.m. on December 6, 2018.  (*Id*. at Page ID 679, 682.)  At that time, corrections officers placed Patton

---

[5] During his deposition, Patton was asked about the prison records and claimed, without further evidence, that the prison's records were falsified.  (DE 72-2 at Page ID 885.)

back in hard, ambulatory restraints.  (*Id.* at Page ID 682.)  On December 7, 2018, at 9:10 a.m., Lt. Messer removed Patton's lower-leg restraints.  All restraints were removed two hours later at 11:15 a.m.  (*Id.* at Page ID 683.)  In total, Patton was restrained for approximately thirty-nine hours, from 7:30 p.m. on December 5, 2018, until 11:15 a.m. on December 7, 2018, and he was in four-point restraints on December 6, 2018, for approximately seventeen of those hours. (*Id.* at Page ID 678-683.)

The record demonstrates that corrections officers made fifteen-minute and two-hour restraint checks of Patton as required by prison policy, that he was checked by medical and psychology staff, and that Patton was aggressive and non-compliant during his time in restraints.  (*Id.* at Page ID 672-87; DE 56-7 at Page ID 746-48.)  For example, during prison staff's routine fifteen-minute check-ins of Patton while he was in restraints, he was reported to curse at staff, to threaten staff, to kick the cell door, and generally to refuse to comply with staff orders.  (DE 56-2 at Page ID 672-77) (containing numerous entries where Patton would curse at staff, including entries like, "Fuck you cracker").)  Further, when Lt. Asher checked on Patton on December 6, 2018, at 7:51 a.m. while Patton was in four-point restraints, Lt. Asher noted that Patton was "attempting to get the other [inmates] on C-range to riot."  (*Id.* at Page ID 680.)  Then at 3:45 p.m. that day, Lt. Blackburn recorded that Patton continued to be "verbally aggressive" and that a "shield had to be utilized when restraint checks were conducted."  (*Id.* at Page ID 681.)

### C. Patton's Excessive Force Claim Against Lts. Asher and Mullins Based on Contact

Patton's third claim alleges that during a Lieutenant's restraints check at 6:25 a.m. on December 6, Lt. Asher "slammed" Patton to the floor, bent Patton's right wrist backwards, and caused him severe pain.  (DE 1 at Page ID 4.)  Then, according to Patton, when he was placed back on his feet, Lt. Mullins grabbed his right wrist and bent it backwards, which

caused severe pain. (*Id.*)  The Defendants frame the restraints check differently in their Motion, stating that "Patton attempted to pull away from staff, and was placed against the wall in an effort to control his disruptive behavior" and that he "continued to pull away from staff, refusing all orders, and was placed on the ground."  (DE 72-1 at Page ID 833.)

### D. Patton's Deliberate Indifference Claims Against All Defendants

Finally, Patton claims that all five named Defendants were deliberately indifferent to his serious medical needs during his time in restraints on December 5-7, 2018.  (DE 1 at Page ID 3-4.)  In his Complaint, Patton alleges Lt. Blackburn and Nurse Miracle were deliberately indifferent to his serious medical needs on December 5, 2018, when they failed to loosen his restraints, which were hindering his "blood circulation, and obstructing [his] airways."  (*Id.* at Page ID 3.)  He claims Lts. Asher and Mullins were indifferent to his serious medical needs "when they neglected to loosen the restraints when [Patton] informed them that the restraints were to[o] tight hindering [his] blood circulation[,] causing [his] hands to swell, and obstructing [his] airways" during the "two-hour review (restraint check)" in the early morning of December 6, 2018.  (*Id.* at Page ID 3-4.)  As to Nurse Lawson, Patton claims she was deliberately indifferent when she failed to loosen his restraints during the early morning restraints check on December 6, 2018.  (*Id.* at Page ID 4.)

Here, prison records indicate Nurse Miracle completed her first "Health Services Restraint Review Form" at 7:30 p.m. on December 5, 2018, when Patton was first placed in hard, ambulatory restraints.[6]  (DE 56-2 at Page ID 684.)  At that time, Nurse Miracle noted she was "able to place [a] finger between cuff and wrist."  (*Id.*)  Nurses Lawson and Miracle completed numerous checks on Patton while he was in restraints, as did other medical staff.

---

[6] As explained above, following the correction officers' calculated use of force placing Patton in ambulatory restraints, Nurse Miracle performed a medical check on Patton and later stated on camera that she had observed Patton and that, even though he stated otherwise, the restraints were properly applied.  (*See* DE 53 at 32:01-32:31.)

(*Id.* at Page ID 684-87.)  The check-ins by the medical staff noted Patton did not display signs of distress and had a capillary refill of less than three seconds.  (*Id.*)  Additionally, the Health Services records show that Patton was offered use of the toilet, as well as food and water on numerous check-ins.  (*Id.*)  The records further reveal Patton did not use the toilet offered to him for most of the check ins, but he did use the toilet on at least three occasions.  (*Id.*)  Additionally, records indicate Lts. Blackburn, Asher, and Mullins checked on Patton as required by prison policy when they completed lieutenant restraint checks during Patton's time in restraints.  (*Id.* at Page ID 678-81.)

On December 11, 2018, several days after Patton was released from any restraints, he sought and received medical treatment from Nurse Miracle.  (DE 1-1 at Page ID 14.)  To document the clinical visit, Nurse Miracle completed a "Clinical Encounter" form, which noted that Patton complained "[his] restraints were too tight" and that he urged her to "look at [his] wrists." (*Id.*)  Nurse Miracle wrote: "[u]pon visual assessment noted [an] old contusion to bilateral wrists and small area to left forearm measuring approximately 1.5x0.1x0." (*Id.* at Page ID 15.)  She also reported Patton was "able to use wrist/arms without difficulty [and] denie[d] any other problems at this time." (*Id.*)

In his attachments to his Response to Defendants' Motion, Patton has provided evidence of two additional clinic visits at other Bureau of Prisons (BOP) facilities. The first occurred on October 24, 2019; medical staff noted Patton had reported "bilateral wrist/hand nerve damage with numbness and tingling" (DE 75-1 at Page ID 947), and the second occurred on December 29, 2020, where the examiner noted Patton had "2 narrow linear lesions on the front of his low abdomen and 2 narrow linear lesions at his low back area.  All are . . . keloids and arranged in the same plane." (*Id.* at Page ID 944.)  Patton also submitted the affidavits of two people imprisoned with him, which purport to show he has scars around

his wrists and abdomen.  (*See id.* at Page ID 949-50.)  In his deposition in this case, Patton claimed he suffered nerve damage following the incidents on December 5-7, 2018, but he also noted he has never received medicine or treatment for his injuries.  (DE 72-2 at Page ID 891-92.)

### E.   Procedural History

Patton's claims against Defendants are *Bivens* claims.[7]  *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971); *Carlson v. Green*, 446 U.S. 14, 18 (1980) ("*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.").  Patton requests a jury trial and seeks as relief:

> [C]ompensatory awards in the amount of $250,000, (attorney fees, the filing fee for this complaint, attorney fees for any attorney whom might later represent me) (awards for mental suffering $20,000) punitive damages in the amou[n]t of $75,000) additional $100,000 damage awards for the excessive force, additional $10,000 for the other excessive force[,] additional $75,000 for nerve damages[,] additional $25,000 for being placed in four-point restraints[.]

(DE 1 at Page ID 13.)

Defendants filed two previous motions either to dismiss Patton's claims or, in the alternative, for summary judgment.  (*See* DE 50; DE 56.)  The Court denied both of those dispositive motions without prejudice, first to permit Lt. Blackburn to answer Patton's Complaint (DE 54), and then later to permit the parties time to engage in discovery (DE 63).

Defendants filed an Answer to Patton's Complaint (DE 66), discovery commenced (DE 67), and the parties' discovery deadline was December 22, 2020 (DE 70).  The record is devoid

---

[7]  In his Complaint, Patton alleges that his rights under the First, Fifth, and Eighth Amendments and 42 U.S.C. § 2000dd ("Prohibition on cruel, inhuman, or degrading treatment or punishment of persons under custody or control of the United States Government") were violated.  (DE 1 at Page ID 5.)  Because Patton alleges excessive force and deliberate indifference claims, his claims will be analyzed under the Eighth Amendment.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986).

of any discovery having been served upon Defendants by Patton. Defendants conducted discovery in the form of a remote deposition of Patton. (DE 69; DE 71; DE 72-2.) Following discovery, Defendants timely filed their Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment (DE 72), which has been fully briefed and is ripe for review.

## II.   STANDARD OF REVIEW

Defendants have moved for judgment on the pleadings or, in the alternative, for summary judgment. (DE 72-1 at Page ID 835.) Under the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) is judged by the same standard of review as a motion to dismiss under Rule 12(b)(6). *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012). Thus, "[t]o survive a Rule 12(c) motion, 'a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory.'" *Hindel v. Husted*, 875 F.3d 344, 346-47 (6th Cir. 2017) (quoting *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)).

When considering a motion for judgment on the pleadings, courts take as true "all well-pleaded material allegations of the pleadings of the opposing party." *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir. 2007)). Courts may only grant a motion for judgment on the pleadings "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.* Courts read a *pro se* prisoner's complaint "liberally" and accept as true all non-conclusory allegations in the complaint. *Davis v. Prison Health Servs.*, 679 F.3d 433, 437 (6th Cir. 2012).

In support of their Motion, Defendants cite numerous exhibits, including a transcript of Patton's deposition, prison records, and individual declarations. (*See* DE 72-1 (citing exhibits attached to DE 56); DE 72-2; DE 72-3.)  Similarly, Patton has submitted medical records and affidavits in support of his Response to the Defendants' Motion.  (*See* DE 75-1.)  Under the Federal Rules of Civil Procedure, when considering a motion under Rule 12(c), if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Given these circumstances, Defendants' Motion will be analyzed as one for summary judgment.

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard, a party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In other words, to survive summary judgment, a plaintiff cannot rely on conjecture or conclusory accusations.  *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.,* 355 F.3d 515, 533 (6th Cir. 2004) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.") (internal quotation marks omitted)).

In his Response to the Defendants' Motion, Patton alleges that there are six genuine disputes of material fact: (1) whether Lts. Asher and Mullins used excessive force; (2) the extent of Patton's injuries, including "keloids, nerve damage in both hands and wrists, scars

around both wrists and left forearm"; (3) whether there was a legitimate penological justification for placing Patton in restraints; (4) whether Nurse Lawson, Nurse Miracle, Lt. Blackburn, Lt. Asher, and Lt. Mullins were deliberately indifferently to Patton's serious medical needs; (5) whether Lts. Asher, Mullins, and Blackburn denied Patton his basic human needs; and (6) whether Nurse Lawson and Nurse Miracle falsified Health Services documents "confirming the restraints were adequately applied in which they were aware that the restraints were applied extremely tight."  (DE 75 at Page ID 927-28.)

## III.    ANALYSIS

Patton asserts excessive force and deliberate indifference claims against the Defendants.  (DE 1 at Page ID 3-4.)  Each of Patton's claims against the various corrections officers and nurses under the Eighth Amendment will be examined in turn.  In doing so, however, the context surrounding Patton's claims must be acknowledged. Prisons are not comfortable environments and conditions are often "restrictive and even harsh."  *See Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981) ("But the Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort.").

To proceed on his claims, Patton must make a showing by sufficient evidence that each of the Defendants' actions amounts to "cruel and unusual punishment" prohibited by the Eighth Amendment. *See id.* at 347 ("But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.")

### A.    Patton's Civil Rule 56(c)(2) Challenge to Incident Report

Before the Court considers the substance of Patton's claims, Patton's challenge to certain evidence that Defendants rely upon – namely, an incident report – must be addressed.

11

(*See* DE 75 at Page ID 938.)  In his Response to the Defendants' Motion, Patton contests Defendants' reliance upon an incident report filed in the record.  (*See id.*)  The Court assumes, as do Defendants, that Patton challenges the declaration of Carlos Martinez, a Supervisory Attorney at the Consolidated Legal Center in Lexington, Kentucky, and Attachment E to that declaration, which is a December 5, 2018 Incident Report.  (DE 56-2 at Page ID 591, 666; DE 76 at Page ID 965 n.1.)  Patton argues the document is a "frivolous fabricated incident report that allegedly occurred on December 5, 2018" filed by "Counsel Martinez" and that it cannot be presented in a form that would be admissible in evidence. (*See id.*)  Patton contends that he has provided sufficient evidence—a printout of his disciplinary record received while in BOP custody—to refute the incident report.  (*Id.*; DE 75-1 at Page ID 951.)

Civil Rule 56(c)(2) provides that, on a motion for summary judgment, a party may object that supporting materials "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Here, Patton directly challenges the incident report's authenticity and legitimacy, relying on the fact that this report is not referenced in his disciplinary history.  With a challenge under this Rule, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c) (Advisory Committee Notes, 2010 Amendment). Defendants contend that Patton's reliance upon a printout of his disciplinary record to support the conclusion that the report is fabricated is mistaken. (DE 76 at Page ID 965 n.1.) Defendants explain that because an incident report can be generated without a prisoner being disciplined for the incident, Patton has not sufficiently supported his claim that the incident report is false.  Defendants also note that corrections officers did not allege in the report that any discipline stemmed from the incident, other than officers placing Patton in restraints.

Further, Attorney Martinez includes in his declaration verification that he accessed the attachments to his declaration through "a centralized electronic database known as SENTRY," which "contains information of an inmate's Personal Data, Administrative Remedies, Disciplinary History, Housing Assignments, Sentence Calculation, among other pertinent information." (DE 56-2 at Page ID 591.) This indicates that the incident report has not been "falsified," but rather demonstrates that the incident report is an authentic business record "kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit," pursuant to Federal Rule of Evidence 803(6)(B).

The absence of discipline on Patton's record for the December 5, 2018 incident does not give rise to an inference that the documentation surrounding the incident is fraudulent. (DE 76 at Page ID 965 n.1.) Patton has not shown pursuant to any authority that an incident report is issued only when an inmate is subject to discipline that is reported on the inmate's record. Patton's objection to the incident report is not well-taken and is rejected.

### B.    Patton's Excessive Force Claims

The Eighth Amendment prohibits prison officials from using excessive force against imprisoned persons. *See, e.g.*, *Wilkins v. Gaddy*, 559 U.S. 34, 37-40 (2010) (per curiam); *Hudson v. McMillian*, 503 U.S. 1, 4-9 (1992); *Whitley v. Albers*, 475 U.S. 312, 318-22 (1986). To maintain prison security and discipline, however, imprisoned persons may be subjected to physical contact that would be actionable as assault under common law. *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002). "Moreover, not every push or shove, even if it appears to be unnecessary, violates a prisoner's constitutional rights." *Hampton v. Alexander*, 76 F.3d 378 (table decision), 1996 WL 40237, at *1 (6th Cir. Jan. 31, 1996). Still, "[a]lthough prison discipline may require that inmates endure relatively greater physical contact, the Eighth Amendment is nonetheless violated if the offending conduct reflects an unnecessary and

wanton infliction of pain." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted).

An Eighth Amendment claim alleging excessive force by prison officials has both an objective and subjective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). Objectively, the pain inflicted by the prison official must be "sufficiently serious" to offend "contemporary standards of decency." *Williams*, 631 F.3d at 383. Relatedly, the nature and extent of a prisoner's injury may be indicative of the amount of force applied. *See Cordell*, 759 F.3d at 580-81; *see also Hudson*, 503 U.S. at 9.

The subjective component looks to the state of mind of the prison official. *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). The question "ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 320-21). To evaluate the prison official's state of mind, a district court must consider the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officers, and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 7.

### 1. Patton's Excessive Force Claim Against Lt. Blackburn Based on Lt. Blackburn's Animus

Patton first claims that Lt. Blackburn placed Patton in "(steel handcuffs) restraints" for Lt. Blackburn's own "personal satisfaction" rather than to restore discipline in the prison. (DE 1 at Page ID 3); *Whitley*, 475 U.S. at 320-21. On this claim, Patton has the burden to come forth with evidence that goes beyond "speculation, conjecture, or fantasy." *Arendale*, 519 F.3d at 605 ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment.").

First, applying the objective component standard, the guiding question is whether there is a sufficient showing that a reasonable jury could conclude that "the pain inflicted" by Lt. Blackburn was "sufficiently serious" to offend "contemporary standards of decency" when Lt. Blackburn originally placed Patton in hard, ambulatory restraints on December 5, 2018. *Cordell,* 759 F.3d at 580. As discussed above, the record is undisputed that Lt. Blackburn placed Patton in restraints after Patton became agitated and prison officials perceived him as a threat to security. (DE 56-2 at Page ID 678 ("I/m Patton refused to submit[] to hand restraints to allow staff to remove him from law library. I/m verbally threatened to assault staff. I/m placed in hard-ambulatory restraints."); DE 72-2 at Page ID 877-78).) The record is also undisputed that hard, ambulatory restraints were chosen because Patton has a history of defeating soft restraints. (DE 56-2 at Page ID 594 n.1.) Further, Patton provides no evidence other than conclusory assertions that the prison records are "falsified" to rebut the prison's documentation of the incident, which showed Lt. Blackburn followed prison policy when applying restraints to Patton.[8]

Concerning injuries, Patton received a medical evaluation four days after being placed in restraints, which evaluation revealed he had bruising on his wrists and forearm, but which also revealed he was "able to use wrists/arms without difficulty." (DE 1-1 at Page ID 15.) Patton testified in his deposition that when he lays on his side, or puts pressure on his waist, it feels "like a big knife" (DE 72-2 at Page ID 889-90), and he further claimed he has nerve damage in his hand, and described it as excruciating pain and numbness in his hands and wrists (*id.* at Page ID 890-91). And medical records do note that Patton has keloid scars. (DE 75-1 at Page ID 944.)

---

[8] This documentation includes handheld video of corrections officers applying restraints to Patton. (*See* DE 53.)

Although scarring and bruising may be the unfortunate outcomes of the discipline that occurs behind prison walls, they are the sort of injuries that society would expect to occur when the need arises for prison officials to use force. The fact that correction officers followed policy is evidence they took actions to mitigate against more serious injury. (*See* DE 56-2 at Page ID 667-70); *see also Cordell*, 759 F.3d at 580 (explaining that the objective component requires a "contextual" investigation). Moreover, Nurse Miracle performed a medical assessment on Patton immediately after he was placed in restraints and noted that she could place a finger between the cuffs and his wrists. (*See* DE 53 at 32:01-32:31.) Medical staff did not note serious injuries in any of their encounters with Patton. Thus, Patton's claim against Lt. Blackburn fails under the objective component of the excessive use of force analysis.

Second, even if Patton has put forward sufficient evidence regarding his injuries on the objective component, he still fails to put forward sufficient evidence concerning the subjective prong of his excessive force claim against Lt. Blackburn. Here, the record shows that Lt. Blackburn placed Patton in restraints on December 5, 2018, after Patton refused another officer's order to change into paper clothing.[9] (DE 56-2 at Page ID 666, 678; DE 72-2 at Page ID 877-78.) Because uncontrolled disruptive behavior within a prison could lead to injury—either to Patton, other prisoners, or the corrections officers themselves—Lt. Blackburn's actions in placing Patton in restraints were reasonable. *See Whitley*, 475 U.S. at 322 ("Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury."). Simply stated, the record demonstrates that Lt. Blackburn did not act "maliciously and sadistically" when he placed

---

[9] There is no dispute between what Patton said in his deposition and what prison records show regarding this incident: Lt. Blackburn only placed Patton in restraints after Patton refused an order and caused a disturbance in the law library. (DE 56-2 at Page ID 666, 678; DE 72-2 at Page ID 878.)

Patton in restraints after the disturbance in the SHU law library, (DE 56-2 at Page ID 666, 678; DE 72-2 at Page ID 877-78), but rather acted as a reasonable corrections officer would have acted when faced with a disruptive person in his charge. *See Whitley*, 475 U.S. at 322.

Further, the record demonstrates Lt. Blackburn applied a reasonable amount of force necessary to control Patton. On this point, the Court observes that Patton ultimately complied with orders and was removed from the SHU law library in hand restraints. (DE 56-2 at Page ID 666-68.) After corrections officers stopped the initial disruption in the library, they placed Patton in hard, ambulatory restraints while they waited for him to calm down. (*Id.*). The corrections officers state they chose to place Patton in hard, ambulatory restraints not for malicious or sadistic reasons, *see Whitley,* 475 U.S. at 321, but because Patton has a history of defeating soft, ambulatory restraints. (DE 56-2 at Page ID 594 n.1.)

On these facts, Patton has not shown that the amount of force used by Lt. Blackburn was excessive compared with the need Lt. Blackburn faced to use force in the first place. Additionally, the record shows that Lt. Blackburn made efforts to temper the severity of the forceful response. *See Whitley,* 475 U.S. at 320-21 (factoring "any efforts made to temper the severity of a forceful response" in analyzing whether force was applied in good faith). For example, the calculated use of force team removed Patton with a minimal use of force, and hard, ambulatory restraints were only chosen based on Patton's history of defeating restraints. (DE 56-2 at Page ID 594 n.1.) Thus, Patton's claim against Lt. Blackburn also fails under the subjective component of the excess use of force analysis.

In such a posture, summary judgment will be granted to Lt. Blackburn on Patton's excessive force claim against him.

2.      **Patton's Excessive Force Claim Against Lts. Asher and Blackburn Based on Length of Restraint**

Patton next argues that Lts. Asher and Blackburn kept him in restraints for longer than was necessary.  (DE 75 at Page ID 932.)  This excessive force claim is analyzed under the same framework discussed above.  *Williams*, 631 F.3d at 383.  Within this context in particular, the Court observes that, "[a]lthough the improper use of restraints may violate the Eighth Amendment, physical restraints are constitutionally permissible where there is penological justification for their use."  *Kennedy v. Doyle*, 37 F. App'x 755, 757 (6th Cir. 2002) (internal citations omitted).

First, concerning the objective component, the guiding question is whether a reasonable jury could conclude that "the pain inflicted" by Lts. Asher and Blackburn was "sufficiently serious" to offend "contemporary standards of decency" when the lieutenants kept Patton in restraints for approximately thirty-nine hours on December 5-7, 2018.  (DE 56-2 at Page ID 672-87); *Cordell,* 759 F.3d at 580.  As discussed above, Patton's complained-of injuries are bruising, scarring, and nerve damage largely unconfirmed by medical records. (DE 1-1 at Page ID 15; DE 72-2 at Page ID 890-91; DE 75-1 at Page ID 944.)  These are the sort of injuries that can arise when an imprisoned person's disruptive actions require the use of force to maintain discipline, as happened here.  *See Reist v. Orr*, 67 F.3d 300 (table decision), 1995 WL 592041, at *2 (6th Cir. Oct. 5, 1995) ("Although an Eighth Amendment claim is not precluded in the absence of serious injury, . . . the extremely minor nature of the injuries indicated that [plaintiff] was not subjected to a malicious and sadistic attack.").

Second, once again assuming that Patton has put forward sufficient evidence on the objective component, his excessive force claim based on his time in restraints still fails on the subjective component.  Here, the record supports corrections officers' position that they kept Patton in restraints only as long as necessary for him to calm down.  (DE 56-2 at Page ID

18

672-87.)  The record demonstrates that Patton remained a threat to prison security during his time in restraints (DE 56-2 at Page ID 672-87), and Patton has not put forward sufficient evidence to permit the jury to find otherwise.  *See Reist*, 67 F.3d 300, at *3 ("[Plaintiff's] self-serving statements do not sustain his burden of proof in light of the overwhelming evidence submitted by the defendants that minimal force was used to control an unruly prisoner.").

Further, there is not sufficient evidence from which a jury could reasonably conclude that corrections officers kept Patton in restraints "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21.  Instead, uncontroverted prison records document the need for the application of force.  (*See* DE 56-2 at Page ID 672-87.)  For example, after Patton was first placed in restraints, Lt. Blackburn stated on camera that Patton would remain in restraints until calming behavior was achieved.  (*See* DE 53 at 30:58-31:17.)  And, throughout the thirty-nine hours that Patton was restrained, including the seventeen hours he was held in four-point restraints, corrections officers noted that he continued to curse at staff, to threaten staff, and to generally be noncompliant with officers' directions.  (*See, e.g.*, DE 56-2 at Page ID 672-77.)  Lt. Blackburn and Lt. Asher could reasonably perceive these actions by Patton to be disruptive and a threat to institutional security.  (*See id.*)

Indeed, Lt. Asher noted during his two-hour check at 7:51 a.m. on December 6, 2018, when Patton was in four-point restraints, that Patton was "attempting to get the other [inmates] on C-range to riot." (*Id.* at Page ID 680.)  Lt. Blackburn's subsequent entry on December 6, 2018, at 3:45 p.m. recorded that officers needed to use a shield to enter Patton's cell to check his restraints.  (*Id.* at Page ID 681.)  And, even as late as 7:45 p.m. on December 6, 2018, a lieutenant not presently named in this suit reported that Patton "continue[d] to make threats toward staff and [was] refusing staff orders." (*Id.*)

19

Because officers started Patton in ambulatory restraints and only transitioned him to four-point restraints when he was unable to calm down or follow officers' orders (*id.* at Page ID 672-87) and kept him in restraints only as long as they deemed necessary for him to calm down (*id.*), these officers' actions can appropriately be viewed as "temper[ing] the severity of a forceful response." *See Whitley*, 475 U.S. at 321. Thus, Patton has not put forward actual evidence to counter or undermine the legitimacy of Defendants' showing that there was a need to place him in restraints for thirty-nine hours, that the corrections officers reasonably perceived Patton as a threat to safety, and that the named officers took efforts to temper the severity of their response. *See id.*; *see also Kennedy*, 37 F. App'x at 757 ("Summary judgment is proper to the extent that [plaintiff] asserted in his complaint that his placement in restraints on numerous occasions constituted the use of excessive force."); *Anthony v. Gilman*, No. 4:03-cv-87, 2006 WL 222842, at *4 (W.D. Mich. Jan. 26, 2006) ("However, the use of [top of bed] restraints does not necessarily amount to the unnecessary and wanton infliction of pain. . . . This is particularly true where the restraints are justified by a security concern."). Accordingly, Lts. Asher and Blackburn will be granted summary judgment on this claim.

### 3.   Patton's Excessive Force Claims Against Lts. Asher and Mullins Based on Contact

Patton's third claim is that Lts. Asher and Mullins used excessive force when conducting a restraint check on the morning of December 6, 2018. (DE 1 at Page ID 4.) Here, there is a dispute of fact between Patton and Lts. Asher and Mullins. (DE 72-2 at Page ID 881-82; DE 72-1 at Page ID 833.) At the summary judgment stage, when faced with a dispute of fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, to survive a motion for summary judgment, a disputed fact must be "material," meaning that it must "affect the outcome of the suit under the governing law." *Id.* at 248. Upon review of this claim, Patton's

20

evidence does not create a genuine dispute of *material* fact that would show Lts. Asher and Mullins used excessive force when transitioning him to four-point restraints.

In his deposition testimony, Patton described the incident with Lts. Asher and Mullins as follows:

> The next day – the next day – next day is December 6th, next day Lieutenant Asher, Lieutenant Mullins and there[ ] was a officer came in restraint checked. Lieutenant Asher came in same way as Lieutenant Blackburn, using the same language, and cursing me and my cellmate.

> Talking about something he made a statement saying something I was pissing him off or something.  He slammed me on the ground.  Bit my arm.  And after he slammed me he put his right knee like on my stomach area.  He pushed down on it.  Bent my wrist backward then Lieutenant Mullins joined in.  Got his little fun in bent my wrist too, my right wrist.  Then after that they filed some fraudulent report and put me in the hard restraints.

(DE 72-2 at Page ID 881-82; *see also* DE 75 at Page ID 935 (Patton pointing out that he was "already physically restrained by steel handcuffs[,] chain around his waist and leg irons around his ankles" when this altercation took place).)  Meanwhile, Lt. Asher's entry on the Two-Hour Lieutenant Restraints Check Form from December 6, 2018, at 6:25 a.m. states in relevant part:

> Inmate attempted to pull away from staff and was placed against the wall to control his disruptive behavior.  I/m continued to be aggressive towards staff and attempted to pull away from staff and was placed on the ground to control his disruptive behavior.

(DE 56-2 at Page ID 679.)

As an initial matter, Patton's contentions that the lieutenants filed fraudulent reports and that Lt. Asher bit Patton's arm are unsubstantiated beyond Patton's self-serving testimony at the deposition.  As discussed above, Patton has failed to point to any other evidence to support his belief and corroborate his assertions that the documents in the record are forged or otherwise untrue.  (DE 76 at Page ID 965 n.1.)  Similarly, there is no evidence of a bite wound in the medical records Patton provided.  (*See, e.g.*, DE 1-1 at Page ID 15.)

During a visit Patton had with medical staff several days after Lt. Asher allegedly bit him, the nurse reported "[u]pon visual assessment noted old contusions to bilateral wrists and small area to left forearm measuring approximately 1.5x0.1x0." (*Id.*) No contemporaneous medical report notes any bite wound Patton would have suffered. (*Id.*) Accordingly, because Patton has not come forth with something other than "speculation, conjecture, or fantasy" that these records are falsified and that Lt. Asher bit him, these claims should not move forward. *See Arendale*, 519 F.3d at 605.

The remaining contentions – that Lt. Asher slammed Patton on the ground and kneed him in the stomach and that both Lts. Asher and Mullins bent his wrist backward (DE 72-2 at Page ID 882) – are not enough to prove a malicious and sadistic purpose to cause the harm necessary for an Eighth Amendment violation. *Whitley*, 475 U.S. at 320-21. To be sure, "not every push or shove, even if it appears to be unnecessary, violates a prisoner's constitutional rights." *Hampton*, 76 F.3d 378 (table decision), 1996 WL 40237, at *1.

Concerning the objective component, the medical records provided do not show an injury to Patton caused by these corrections officers when they transferred Patton from hard, ambulatory, restraints to four-point restraints. (*See* DE 1-1 at Page ID 15.) Indeed, at Patton's medical visit on December 11, 2018, he only complained of bruising that arose from the restraints. (*Id.*) Absent from the medical file are any injuries from a kick to the stomach area, a bite, or a bent wrist. (*Id.*)

Even assuming that Patton has sufficiently demonstrated the objective component, his claim still fails on the subjective component. Here, even when making all justifiable inferences in Patton's favor, the lieutenants' actions appear in line with how a reasonable officer would respond to maintain control over a non-compliant person in their custody. In particular, the prison records state that Patton attempted to pull away from staff, which is

why he was placed against the wall and eventually on the ground.  (*See* DE 56-2 at Page ID 679.)  Put simply, Patton has failed to point to sufficient evidence to show that these Defendants acted maliciously or sadistically to cause him harm. *See Whitley,* 475 U.S. at 320-21; *see also Reist,* 67 F.3d 300 (table decision), 1995 WL 592041, at \*2 (agreeing with the district court's description of the case as being "a case of plaintiff's word against a barrage of unrefuted evidence in support of defendants' motion including medical evidence, the critical incident reports, the witnesses at plaintiff's major misconduct hearings, and all documents and evidence presented at plaintiff's major misconduct hearings.") Accordingly, these Defendants will be granted summary judgment on Patton's excessive force claims against them.

### C.    Patton's Deliberate Indifference Claims Against All Defendants

Patton's other category of claims is that each of the Defendants were deliberately indifferent to his serious medical needs; namely, he claims that the restraints were too tight, that they impacted his blood circulation, and that their use resulted in lasting nerve damage. (DE 1 at Page ID 3-4.)  Of course, the Eighth Amendment requires the government to provide medical care for inmates, and a failure to do so may constitute cruel and unusual punishment. *Harrison v. Ash*, 539 F.3d 510, 517-18 (6th Cir. 2008) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).

Just like an excessive use of force claim, a deliberate indifference claim consists of both an objective and subjective component.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The objective component requires a plaintiff to demonstrate the existence of a "sufficiently serious" medical need.  *See Scott v. Ambani*, 577 F.3d 642, 648 (6th Cir. 2009). "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity

for a doctor's attention." *Harrison*, 539 F.3d at 518 (internal quotation marks omitted).  By contrast, "[t]o satisfy the subjective component, the prisoner must allege facts which show that the prison official had a 'sufficiently culpable state of mind.'" *Scott*, 577 F.3d at 648 (citing *Farmer*, 511 U.S. at 834).  "It must be shown that the official acted with reckless disregard for a substantial risk to the prisoner, that he drew the inference, and that he disregarded the risk." *Id.*

Patton's deliberate indifference claims can be broken down into two groups.  First, Patton claims that on December 5, 2018, he told Lt. Blackburn and Nurse Miracle that his ambulatory restraints were too tight and that they neglected to loosen them.  (DE 1 at Page ID 3.) Second, Patton claims that Lt. Asher, Lt. Mullins, and Nurse Lawson were deliberately indifferent to his serious medical needs when they heard him complain his restraints were too tight and refused to loosen his restraints on the morning of December 6, 2018.  (*Id.* at Page ID 4.)  Defendants contend that Patton has failed to satisfy either of the prongs of an Eighth Amendment deliberate indifference claim with respect to these allegations.

### 1.   Deliberate Indifference Claims Against Lt. Blackburn and Nurse Miracle

Patton's claims that Lt. Blackburn and Nurse Miracle were deliberately indifferent to his medical needs when he was initially placed in ambulatory restraints fails on both prongs of the analysis.  Here, under the objective component, medical records show that four days after being restrained, Patton's wrists were bruised.  (DE 1-1 at Page ID 15.)  Similarly, the affidavits submitted by two people imprisoned with Patton state that Patton has scars around his wrists and waist.  (DE 75-1 at Page ID 949-50.)[10]  One of the affiants further attests that

---

[10] Defendants argue that, in addition to the affidavits not being helpful to Patton's claims, they are also improper pursuant to Civil Rule 56(c)(4), "which requires that affidavits or declarations opposing a motion for summary judgment 'be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"  (DE 76 at Page ID 965.)

he believes the scars are consistent with Patton being placed in restraints that were applied too tightly.  (DE 75-1 at Page ID 949.)  Finally, Patton points to his complaints of nerve damage in his wrists at a clinic visit.  (*Id.* at Page ID 947.)

Patton's evidence under the objective prong is dubious for several reasons.  First, it is questionable whether bruising by itself rises to the level of a "serious medical need."  *See Lucas v. Warden Lewisburg USP*, 573 F. App'x 205, 208 (3d Cir. 2014) ("At the outset, it is questionable whether [plaintiff's] wrist issue, described in the medical records as 'mild,' would qualify as a 'serious medical need' in the Eighth Amendment context.").  Second, Nurse Miracle noted that Patton had good use of his hands and wrists at the visit following his time in restraints.  (DE 1-1 at Page ID 15.)  Third, Patton's evidence to demonstrate a causal connection between his claimed injuries and the incidents involved in his complaint is questionable.  For example, although Patton claims he has scars and possible nerve damage, he supports a claimed causal connection for the scarring and his restraint as alleged in this case based on the affidavit of a fellow prisoner.  (DE 75-1 at Page ID 949.)  Yet Patton testified during his deposition that he developed scars around his wrists and waist from a restraint incident in October 2019, for which incident he filed a separate action in April 2020.  (DE 72-2 at Page ID 873-74; *see Richard Patton v. Autumn Lawson, et al.,* Case No. 6:20-cv-79-DLB-EBA.)[11]  In such a posture, his deliberate indifference claim against Nurse Miracle and Lt. Blackburn likely fails on the objective prong.  *See, e.g.*, *Lucas*, 573 F. App'x at 208.

_____

[11] A BOP Health Services Clinical Encounter sheet dated 11/07/2018 attached to Patton's Complaint in that case notes a subjective complaint of "wrist pain after I was in restraints last Tuesday" (*see* 6:20-cv-79-DLB-EBA, DE 1-1 at Page ID 20), and the exam comment was "abrasion to top of bilateral wrist from cuffs" (*id.* at Page ID 21).  Other Health Services sheets are attached to the Complaint in that case reflecting Patton's various visits to Health Services after being placed in restraints.  (*Id.* at Page ID 15-25.)  In Case No. 6:21-cv-98-GFVT, Patton complains that on 02/23/2019 corrections officers came to his cell and used excessive force, slamming him to the ground and causing "excruciating pain" in both wrists. (*see* 6:21-cv-98-GFVT, DE 1 at Page ID 2.)  Patton's Health Services Clinical Encounter sheet of 02/23/2019 in that case reflects Patton reported "multiple complaints but

25

However, even assuming that Patton has put forward sufficient evidence to show that his injuries allegedly arising from his early December 2018 restraint are sufficiently serious, his deliberate indifference claim still fails on the subjective prong of the analysis. Here, Patton has failed to prove that Lt. Blackburn or Nurse Miracle perceived facts to infer there was substantial risk to him, that they did in fact draw such an inference, and that they then disregarded that risk to him. *See Scott*, 577 F.3d at 648. In fact, the record shows that these Defendants followed BOP policy and made restraint checks at all required times to assess Patton's physical condition from the restraints that were applied. (DE 56-2 at Page ID 678-87.)

Specifically, regarding Lt. Blackburn, the record shows that he made three restraint checks on December 5, 2018, at 7:30 p.m., 9:30 p.m., and 10:01 p.m., and several more on December 6, 2018. (DE 56-2 at Page ID 678-81.) Each time, Lt. Blackburn noted Patton had neither calmed nor used the toilet. (*Id.*) Similarly, Nurse Miracle's first check of Patton occurred on December 5, 2018, at 7:30 p.m., where she noted she was "able to place finger between cuff & wrist." (*Id.* at Page ID 684.) A second check occurred at 9:30 p.m. that evening, and Nurse Miracle again was "able to place one finger between cuff/wrist." (*Id.*) Nurse Miracle performed a third check at 10:01 p.m., and she recorded "cap refill good" and that she was "able to place finger between cuff/wrist." (*Id.* at Page ID 685.)

With this evidence, the record shows both Nurse Miracle and Lt. Blackburn did not have the mindset necessary to be deliberately indifferent to Patton's medical needs. Thus, summary judgment will be granted to them on this claim against each of them.

### 2.   Deliberate Indifference Claims Against Lt. Asher, Lt. Mullins, and Nurse Lawson

---

no specific injuries verbalized. Inmate stating, "The restraints are to[o] tight, the chain around my stomach is to[o] tight, my ankle restraints are to[o] tight. They are impeding my circulation." (*Id.* at Page ID 12.)

Patton also contends that Lt. Asher, Lt. Mullins, and Nurse Lawson were deliberately indifferent to his medical needs on December 6, 2018. (DE 1 at Page ID 3-4.)  As discussed above, Patton's claimed injuries are likely not sufficiently serious to satisfy the objective component.  *See Lucas*, 573 F. App'x at 208; *see also Harrison*, 539 F.3d at 518.

Further, regarding the subjective component, after Patton was placed in four-point restraints at 6:25 a.m. on December 6, Nurse Lawson's restraints check noted: "no s/s of distress or decreased circulation."  (DE 56-2 at Page ID 685.)  She made another check of Patton's condition in four-point restraints at 7:51 a.m., where again she noted: "No s/s of distress, no s/s of decreased circulation" as well as "cap refill <1 sec."  (*Id*. at Page ID 686.)  All remaining health checks, completed by non-parties to this suit, show no distress missed by Nurses Miracle and Lawson in their routine checks.  (*See id*.)

Additionally, Lt. Asher and Lt. Mullins made routine restraint checks during this time period.  (*Id*. at Page ID 679-80.)  Lt. Mullins made three checks on December 6, 2018, at 12:01 a.m., 2:01 a.m., and 4:01 a.m.  (*Id*. at Page ID 679.)  Lt. Asher made four checks on December 6, 2018, at 6:25 a.m., 7:51 a.m., 9:45 a.m., and 11:45 a.m.  (*Id*.)  Thus, upon review, the record reflects numerous medical checks, and the record is absent of any evidence that the Defendants acted with a reckless state of mind during these checks.[12]  Therefore, Patton's claim of deliberate indifference fails on the subjective prong.  *See Scott*, 577 F.3d at 648.

In sum, because there is no dispute of material fact on whether the Defendants were deliberately indifferent, and there is no evidence upon which a jury could reasonably find for

---

[12] In this regard, the record does not support Patton's arguments that Lt. Asher, Lt. Mullins, and Lt. Blackburn denied him "his basic human needs."  (DE 75 at Page ID 928).  Instead, prison records show that Patton's health and the restraints in which he was held were monitored on a regular basis, and that he was offered food, water, and the use of a toilet during his time in restraints.  (DE 56-2 at Page ID 678-87.)

Patton, these Defendants will also be granted summary judgment on Patton's deliberate indifference claims against each of them.

### D.    Qualified Immunity

Finally, the Court notes that all Defendants have raised qualified immunity as an affirmative defense. (*See, e.g.*, DE 66 at Page ID 812.) Under Supreme Court precedent, "officers are entitled to qualified immunity . . . unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted); *see also Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (applying three-part test to determine whether defendants are entitled to qualified immunity).[13]

Procedurally, Defendants initially claimed that they were entitled to qualified immunity in their first dispositive motion. (*See* DE 50-1 at Page ID 393.) The Court denied that motion without prejudice to permit Lt. Blackburn to respond to Patton's complaint. (*See* DE 54 at Page ID 557.) Defendants raised qualified immunity again in their second dispositive motion. (*See* DE 56-1 at 586.) Upon review, the Court denied Defendants' motion "without prejudice to their right to reassert their arguments after the parties have engaged in discovery." (*See* DE 63 at Page ID 806.) Defendants also raised the defense in their answer. (*See* DE 66.) In their present Motion, Defendants maintain that:

> Despite Patton's assertions to the contrary, he has simply failed to produce any evidence showing deliberate indifference to any serious medical need, or excessive force on the part of any Defendant in this matter as a matter of law. Thus, the Defendants are entitled to the defense of qualified immunity, and the claims against them must be summarily dismissed.

---

[13] In *Williams*, the Sixth Circuit stated: "The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams*, 186 F.3d at 691.

(*See* DE 72-1 at Page ID 851.)  In his Response, Patton argues that Defendants are not entitled to qualified immunity.  (*See* DE 75 at Page ID 935-38.)

As discussed above, Patton has not put forward evidence to show that a genuine dispute of material fact exists regarding whether any of the Defendants violated his constitutional rights.  Indeed, he has not shown that the Defendants should not be granted summary judgment on either his excessive force or deliberate indifference claims.  Thus, he fails to overcome the first prong of the qualified immunity analysis: that the Defendants violated his constitutional rights. *See Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006) (explaining that when the defense of qualified immunity is raised, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity"); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may address the prongs of the qualified immunity analysis in either order).

Further, regarding the clearly established prong, "[f]or a right to be clearly established, the right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Cordell*, 759 F.3d at 587 (internal quotation marks omitted).  In this case, the evidence before the Court does not demonstrate that the Defendants should have known that their actions on the subject dates violated Patton's constitutional rights. Instead, the record demonstrates that these officers acted in a constitutionally permissible manner. *See generally Whitley*, 475 U.S. at 321-22 (explaining deference afforded to prison officials to use force when necessary); *see also Estelle*, 429 U.S. at 106 ("In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").

Accordingly, because Patton has not shown that the Defendants violated his clearly established Eighth Amendment rights, the Defendants are entitled to qualified immunity.

*See Johnson v. Slone*, No. 7:16-274-KKC, 2018 WL 1402376, at *5 (E.D. Ky. Mar. 20, 2018) ("The Court has concluded above that no Eighth Amendment violations occurred. Thus, Defendants are entitled to qualified immunity.").

### IV.   CONCLUSION

For all the reasons set forth above, Defendants' Motion for Summary Judgment (DE 72) will be granted. Accordingly, **IT IS HEREBY ORDERED** as follows:

(1)   Defendants' Motion for Judgment on the Pleadings (DE 72) is **DENIED**;

(2)   Defendants' Motion for Summary Judgment (DE 72) is **GRANTED**.

(3)   The Court will enter a Judgment contemporaneously with this opinion.

(4)   This action is **STRICKEN** from the Court's docket.

Dated September 30, 2021.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY